**FILED**
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS

Mar 9, 2018

OFFICE OF THE CLERK

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**MARK FOCHTMAN, CORBY SHUMATE,
MICHAEL SPEARS, ANDREW DANIEL,
FABIAN AGUILAR, and SLOAN SIMMS
individually and on behalf of all others
similarly situated**                                    **PLAINTIFFS**


**v.**            **Case No.** ___18-5047_____
*Severed from Case Number* **5:17-cv-05228-TLB**

**DARP, INC., HENDREN PLASTICS, INC.,
and JOHN DOES 1-29**                                    **DEFENDANTS**

---

## CLASS ACTION COMPLAINT

---

### I. INTRODUCTION

1.      This is a class action for violations of the Arkansas Constitution's prohibition on slavery, unpaid minimum wage and overtime under the Arkansas Minimum Wage Act, and for violations of the Arkansas Human Trafficking Act of 2013. Defendant DARP, Inc. ("DARP") claims to operate counseling and rehabilitation services. Plaintiffs attended DARP for court-ordered rehabilitation services. Instead of receiving counseling and treatment, however, Plaintiffs were forced to work for various for-profit businesses in Arkansas performing demanding, dangerous manual labor for no pay. DARP's charges have severely circumscribed access to phone calls, making it virtually impossible for them to contact anyone — even their attorneys — outside the presence of DARP staff. Those who are injured on the job are threatened with jail to coerce them into continuing to toil; those who are unable to work are actually jailed.

2.      DARP forces its charges to work at manufacturing, food-processing, and other similar facilities in Arkansas, including Hendren Plastics, Inc. ("Hendren"). At all times, the businesses permit DARP's charges to work in their facilities, directing their work and profiting from their labors. Those individuals are not paid anything for their labor. DARP's scheme is no secret, and all the entities involved generate enormous profits, including reduced labor costs, fraudulent tax savings, and reduced recruiting expenses.

3.      Defendants' scheme violates Arkansas law. The Arkansas Constitution expressly forbids forced labor without compensation. The Arkansas Minimum Wage Act mandates that individuals be paid a minimum wage for their labors, which includes overtime compensation for those who work more than 40 hours in a workweek. Moreover, the Arkansas Human Trafficking Act of 2013 makes it illegal to knowingly force or deceive a person into involuntary servitude. Plaintiffs bring their claims individually and on behalf of the other individuals who were required to work for free. Plaintiffs seek to enjoin DARP from selling their labor, and to recover unpaid wages (including minimum wage and overtime compensation), other compensatory damages, liquidated damages, punitive damages, attorneys' fees, costs, and expenses, and any other relief the Court deems just and proper.

## II. PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff Mark Fochtman is a citizen of Washington County, Arkansas. In 2016 or 2017, Fochtman entered the DARP "treatment" facility as a condition of probation. During this time, DARP put Fochtman to work at Hendren Plastics filling

large containers with plastic beads to be cooked to make floatation platforms. Fochtman was not paid anything for working at Hendren Plastics.

5.      Plaintiff Corby Shumate is a citizen of Benton County, Arkansas. In 2015, Shumate entered the DARP program as a condition of probation. From approximately August 2015 until May 2016, Shumate attended DARP's "treatment" facility near Decatur, Arkansas. During this time, Shumate worked at Hendren Plastics, Inc. At Hendren, he worked melting plastic caps onto boat dock floats, a job that regularly left him burned and injured from molten plastic. Shumate also worked as a mold operator, a physically demanding and dangerous job that resulted in a shattered toe. Despite his injury, Shumate continued to work at Hendren. Shumate was not paid anything for working at Hendren.

6.      Plaintiff Michael Spears is a citizen of Cherokee County, Oklahoma. In 2016, Spears entered the DARP program as a condition of probation. From approximately April 2016 until October 2016, Spears attended DARP's "treatment" facility near Decatur, Arkansas. During this time, Spears worked at Hendren Plastics, Inc. At Hendren, he worked as a mold operator, a physically demanding and dangerous job that resulted in a fractured wrist. Because of his wrist injury, Spears asked Raymond Jones, DARP's president, if he could be reassigned to a different position that would not require him to use his broken wrist. Jones told him that if he could not do the job he was assigned, he could pack up his belongings and leave DARP. Because DARP would not help him, Spears asked his shift supervisor at Hendren if he could be reassigned to a different position that would not require him to use his broken wrist. The shift supervisor told

Spears that if he could not do the assigned job then he would be fired. Despite his injury, Spears continued to work at Hendren. Spears was not paid anything for working at Hendren.

7.      Plaintiff Andrew Daniel is a citizen of Benton County, Arkansas. In 2017, Daniel entered the DARP program as a condition of probation. For approximately 5 months in 2017, Daniel attended DARP's "treatment" facility near Decatur, Arkansas. During this time, Daniel worked at Hendren Plastics, Inc. performing physically demanding, dangerous work. Daniel was not paid anything for working at Hendren.

8.      Plaintiff Fabian Aguilar is a citizen of Cherokee County, Oklahoma. In 2016, Aguilar entered the DARP program as a condition of probation. For approximately 5 months in 2017, Aguilar attended DARP's "treatment" facility near Decatur, Arkansas. During this time, Aguilar worked at Hendren Plastics, Inc. performing physically demanding, dangerous work. Aguilar was not paid anything for working at Hendren.

9.      Plaintiff Sloan Simms is a citizen of Tulsa County, Oklahoma. In 2017, Simms entered the DARP program as a condition of probation. For approximately 8 months in 2017, Simms attended DARP's "treatment" facility near Decatur, Arkansas. During this time, Simms worked at Hendren Plastics, Inc. performing physically demanding, dangerous work. Simms was not paid anything for working at Hendren.

10.     Defendant DARP, Inc. is a foreign corporation that operates in Decatur, Arkansas. DARP is an employer of Plaintiffs and other putative class members within the meaning of the Arkansas Minimum Wage Act. DARP can be served via its registered agent, Raymond Jones, at 1409 Beecher Street, Ft. Gibson, Oklahoma, 74434.

11.    Defendant Hendren Plastics, Inc. ("Hendren") is a domestic corporation with headquarters in Gravette, Arkansas. Hendren is an employer of Plaintiffs and putative class members within the meaning of the Arkansas Minimum Wage Act. Hendren Plastics can be served via its registered agent, James Hendren, at 15316 Highway 59 N., Sulphur Springs, Arkansas 72768.

12.    Defendants John Does 1-29 are currently unknown, but believed to be, other individuals or entities who utilized the labor of DARP's residents, within the state of Arkansas, without paying the individuals for their labor. Plaintiffs have attached hereto as Exhibit A the affidavit of Plaintiffs' attorney attesting that the identifies of John Does 1-29 are unknown pursuant to Ark. Code Ann. § 16-56-125.

13.    Plaintiffs filed their original class action complaint in Benton County Circuit Court on October 23, 2017. *See Fochtman, et al. v. CAAIR, Inc., et al.*, No. 04CV-17-2190. On November 6, 2017, a defendant in that action, Simmons Foods, Inc., removed the action to this Court alleging jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"). Simmons alleged that minimal diversity existed between the parties, the aggregated amount in controversy exceeded $5,000,000.00 exclusive of interest and costs, and there are at least 100 members of the putative class.

14.    On February 27, 2018, this Court granted in part and denied in part Defendants' motions to sever and remand. *See Fochtman, et al. v. CAAIR, Inc., et al.*, No. 04CV-17-2190 (Doc. 97). The Court severed Plaintiffs' claims against Simmons Foods, Inc. and CAAIR, Inc. and transferred those claims to the Northern District of Oklahoma. *Id.*

The Court denied Hendren Plastic's and DARP's motion to remand the action to state court. *Id.* The Court also denied Plaintiffs' motion to remand as moot. *Id.*

15.     This Court has jurisdiction over this Amended Class Action Complaint under CAFA. *See Fochtman, et al. v. CAAIR, Inc., et al.*, No. 04CV-17-2190 (Doc. 97). Minimal diversity exists because Plaintiffs Fochtman, Shumate, and Daniel are citizens of Arkansas and Defendant DARP is a citizen of Oklahoma. In addition, there are at least 100 members in the putative class. Moreover, upon information and belief, the amount in controversy exceeded $5,000,000.00 exclusive of interest and costs at the time it was removed.

16.     Venue lies within this district because a substantial part of the events or omissions giving rise to the claim occurred within this district. 28 U.S.C. § 1391.

17.     At all relevant times, Plaintiffs and the putative class members have been entitled to the rights, protections, and benefits provided by the Arkansas Constitution, Arkansas Minimum Wage Act, and Arkansas Human Trafficking Act of 2013.

18.     At all relevant times, Plaintiffs and the putative class members have been "employees" of Defendants as defined by Ark. Code Ann. § 11-4-203(3).

19.     At all relevant times, Defendants were the "employers" of Plaintiffs and the putative class members as defined by Ark. Code Ann. § 11-4-203(4).

### III. FACTS

20.     Plaintiffs incorporate the preceding paragraphs as if they were set forth herein.

### *DARP*

21.     Defendant DARP, Inc. was founded in 2001 by Raymond Jones, a convicted meth cook and dealer.

22.     DARP operates in Decatur, Arkansas. DARP has two sixty-bed men's facilities in Decatur, Arkansas that houses hundreds of male residents. *See* (*DARP Letter* [Ex. B]). "DARP" is an acronym for "Drug and Alcohol Recovery Program."

23.     DARP purports to be a "faith based alcohol and drug recovery program." (*DARP Mission Statement* [Ex. C]). DARP is an unregulated "recovery program" and is not a licensed drug treatment program.

24.     Upon information, belief, and public reporting, prior to incorporating DARP, Jones had no training in operating drug or alcohol abuse treatment programs. Jones' only experience was as a drug dealer and addict.

25.     DARP's primary source of referrals is through court-ordered programs, and DARP's residents enter the DARP program as a condition of probation and in lieu of serving prison time. If a resident leaves DARP, either voluntarily or involuntarily, they are typically sent to prison.

26.     DARP assigns its residents to work for various for-profit businesses in Arkansas. Each day, residents are transported to poultry processing facilities and other

manufacturing jobs in and around Decatur, Arkansas. For example, DARP sends its residents to work for Hendren Plastics near Decatur, Arkansas.

27.    There, the residents perform dirty and physically demanding manual labor for Hendren. Upon information and belief, DARP residents are also assigned to work for other businesses in Arkansas. The residents routinely work over 40 hours in a workweek, but are not paid.

28.    At DARP, everyone must work: if an employee is sick, injured, or otherwise unable to work, they are kicked out of the program and sent to jail. As a result, the ever-present fear of incarceration ensures DARP's residents report to work despite physical injuries and sicknesses that would prevent them from working. In fact, DARP does not even allow the admittance of residents who have a medical condition that prohibits working. *See* (*DARP: Criteria for Admittance* [Ex. D]). If a resident is unable to work for a short period, instead of being kicked out of the program, extra days are added to the length of time needed to "complete" the program.

29.    Upon information and belief, Hendren Plastics and the other entities contracted with DARP, pay a discounted rate for the labor performed by Plaintiffs and the putative class members.

30.    Despite performing demanding, dangerous, and dirty work, the residents do not receive any wages. (*DARP: Fees and Costs* [Ex. E]). It is DARP's policy that all participants are to work full-time jobs for which they will not be paid. (*DARP: Fees and Costs* [Ex. E]). DARP claims that, on average, its residents work 40-48 hours per week. (*DARP-ADC* [Ex. F]).

31.    DARP's revenue is "generated solely through the various employment contracts the D.A.R.P. has entered into to provide employment for [its] participants." (*DARP: Introduction* [Ex. G]). In essence, DARP sells the labor of it charges to generate revenue and pay expenses, including 6-figure salaries for its executives.

32.    If a resident violates a rule infraction, they are met with discipline, including restarting the program, losing the credit for the time they have attended, or having additional days added to the sentence. (*DARP-ADC* [Ex. F]).

33.    DARP is not a treatment facility, and its "goal is not to educate on the disease of addiction." (*DARP-ADC* [Ex. F]). DARP is not licensed, and it does not employ licensed counselors or social workers.  Thus, DARP does not provide the counseling and rehabilitation services that it purports to provide.

34.    DARP has a revolving door of counselors, with many staying for only a short time. Counselors routinely lack any experience or credentials for treating individuals suffering from serious drug and alcohol addiction.

35.    For example, at one point, DARP employed a resident of a nearby apartment complex as a "counselor," despite the fact the woman had no experience or education whatsoever pertaining to drug or alcohol treatment. In fact, that individual's only experience with addiction was her purported sugar addiction.

36.    The only treatment or counseling DARP residents receive are resident-led Alcoholics Anonymous and Narcotics Anonymous 12-step meetings. Upon information and belief, these meetings are also available free of charge at numerous locations near Decatur, Arkansas. Residents may also occasionally watch a religious movie, and they

are required to attend church services at the Gravette Church of Christ in Gravette, Arkansas.

37.     Instead of receiving promised counseling and treatment, the residents are forced to toil in dirty and dangerous jobs without pay. (*DARP: Fees and Costs* [Ex. E]).

38.     The living conditions at DARP are pitiful. At DARP's Decatur, Arkansas facilities, men are tightly packed 4 to a room. The facilities are covered in bed bugs and other infestations, and the locations stink because of the residents' work.

39.     The meals provided by DARP consist of small portions of out-of-date bologna sandwiches and rejected, unsaleable chicken from Simmons or DARP's own poultry processing facilities.

40.     Moreover, controlled substances, like methamphetamine, are commonly used at the DARP facility, including among residents, staff, and management.

41.     Prior to 2014, Arkansas Community Correction licensed DARP as an authorized Transitional Housing Facility where parolees could be housed as part of their early release. In Fall 2014, however, ACC withdrew the license because DARP did not pay its residents, including Arkansas parolees, at least the minimum wage for their work. *See* (*ACC Letters* [Ex. H]).

42.     Upon information and belief, Arkansas parolees were working for Hendren Plastics through DARP when ACC refused to renew DARP's license.

43.     It strains credulity to believe that Hendren Plastics was unaware of the fact that ACC refused to relicense the program because DARP did not pay its residents for their work.

44.     Moreover, DARP readily admits that it, not their residents, earn money from the work performed by their residents. *See* (*DARP Fees & Costs* [Ex. E]). Had Hendren Plastics made any inquiry into the program with which it was participating, it would have easily discovered that DARP participants receive nothing for their labor.

45.     As a result, Hendren Plastics knew that DARP retained all of the money earned by Plaintiffs and putative class members. To assume otherwise would be to believe that Hendren Plastics would enter into an arrangement with a convicted meth dealer without reading anything about the program.

46.     Upon information and belief, since Plaintiffs filed their original Complaint in this matter and the issue began receiving national attention, courts in Oklahoma have contacted DARP residents and informed them they can leave DARP and attend another treatment facility.

47.     At DARP, residents have severally circumscribed access to phone calls and the internet. Upon information and belief, any phone calls made by residents, including calls to family or legal counsel, must be done in the presence of a DARP staff member.

48.     In addition, DARP representatives travel to its residents' drug court hearings to ensure the residents do not make disparaging remarks about the program in court. As a result, DARP residents do not have a legitimate avenue to complain about the conditions at DARP.

49.     Defendants' scheme is highly profitable. For example, upon information, belief, and public reporting, DARP founder Raymond Jones owns two Corvettes which are referred to as "DARP-1" and "DARP-2."

50.     DARP has also been the model for other similar programs. For example, CAAIR, Inc. is based near Jay, Oklahoma and houses and employs hundreds of male residents in on-site dormitories. "CAAIR" is an acronym for "Christian Alcoholics & Addicts in Recovery."[1]

51.     CAAIR was founded by CEO Janet Wilkerson. Before entering the drug rehabilitation trade, Wilkerson served as Vice President of Human Resources for Peterson Farms, Inc., as well as working as a spokeswoman for Simmons Foods, Inc. and other top poultry companies. In 2008, Simmons acquired Peterson Farms.

52.     During her time at Peterson Farms, Wilkerson found it difficult to staff the overnight shifts at the poultry processing facility.

53.     Upon information, belief, and public reporting, Wilkerson was approached by Raymond Jones, about using men seeking drug rehabilitation to staff the hard-to-fill positions.

54.     Wilkerson and Peterson Farms contracted with DARP to fill these positions, using individuals ordered to attend DARP's rehabilitation program by local drug courts as a pipeline for labor in the poultry industry. Rather than paying the workers, Peterson Farms paid a lower rate for the work directly to DARP.

55.     The arrangement proved to be highly profitable for both Peterson Farms and DARP, and Wilkerson considered it a "win, win, win" situation. (*Wilkerson Letter* [Ex. I]).

---

[1] CAAIR, Inc. was a named Defendant in Plaintiffs' original action. DARP, Inc. and Hendren Plastics, Inc., have been severed into this proceeding.

56.    Upon seeing how profitable such an arrangement could be, Wilkerson left the poultry industry and, along with her husband, Donald Wilkerson, Louise and Rodney Dunnam, created her own labor camp under the guise of a drug recovery program: CAAIR.

57.    Wilkerson and the other CAAIR founders contracted with Raymond Jones, based primarily on his experience from operating DARP, to introduce Wilkerson and the other CAAIR founders to the various Drug Court Judges and District Attorneys in the surrounding area, and provide training and guidance on the development of the program. (*Business Consultant Contract* [Ex. J]).

58.    For his consulting services, Jones was to receive $250,000.00 annually. (*Business Consultant Contract* [Ex. J]).

59.    Eventually, the relationship soured, and the parties were mired in litigation. *See Jones v. Wilkerson, et al.*, No. CJ-2011-238 (Dist. Ct. of Cherokee County, OK). *See also* (*Wilkerson Letter* [Ex. I]).

60.    DARP and the businesses with which it provides labor had an interrelation of operations between the entities, and a common business purpose — providing cheap labor for various enterprises in Arkansas, including poultry processing facilities, chicken farm operations, and other manufacturing enterprises. DARP and the other businesses with which it provides labor also controlled the terms of employment of Plaintiffs and the putative class members, either directly or indirectly.

61.    DARP and the other businesses with which it provides labor controlled the hours worked by Plaintiffs and the putative class members, either directly or indirectly.

62.     DARP and the other businesses with which it provides labor directed the work of Plaintiffs and the putative class members.

63.     DARP and the other businesses with which it provides labor maintained communications with Plaintiffs and the putative class members and received updates as to the status of their work, either directly or indirectly.

64.     DARP and the other businesses with which it provides labor provided guidance on how each assigned task was to be performed by Plaintiffs and putative class members.

65.     DARP and the other businesses with which it provides labor are joint employers, in that they direct and control Plaintiffs' and the putative class members' work. Thus, DARP and the other businesses with which it provides labor are each directly liable for the violations of Arkansas law in this case.

66.     DARP, Hendren Plastics, and John Does 1-29 are "employers" of Plaintiffs and putative class members under the Arkansas Minimum Wage Act, and, as a result, they are jointly and severally liable for unpaid minimum wages (including overtime compensation), liquidated damages, and attorneys' fees, costs, and expenses.

### *Hendren Plastics, Inc.*

67.     Hendren Plastics, Inc. ("Hendren") is, according to its website, an "unashamedly for profit" business operating in Arkansas that, in conjunction with DARP, employed Plaintiffs and putative class members in unskilled labor positions but did not pay them for their work. Hendren Plastics' CEO is Jim Hendren, the current Senate Majority Leader in the Arkansas State Senate. The Company was co-founded by

Kim Hendren, who is also currently a member of the Arkansas General Assembly. The Hendrens have heavily touted their business experience in their political campaigns.

68.     Hendren, in conjunction with DARP, employed Plaintiffs and the putative class members as employees in Hendren's profit-making business. Plaintiffs and the putative class members were not employed to provide valuable community service like picking up trash on the side of the road or painting and repairing public works, but instead were employed to make dock floatation devices and other products produced by Hendren and sold to generate profit for Hendren.

69.     Hendren Plastics is a difficult place to work. The Company has high employee turnover and has tried various techniques to fill its chronic staffing deficiencies.

70.     Plaintiffs and the putative class members worked alongside, and oftentimes in the place of, typical employees hired to produce Hendren's product.

71.     Upon information, belief, and public reporting, 40% of Hendren's manufacturing workforce was made up of DARP residents who were not paid for their labor.

72.     Likewise, Plaintiffs and the putative class members were not trained in a trade, but instead performed unskilled labor in demanding, dangerous, and dirty environments.

73.     DARP provided its charges to be exploited by Hendren. DARP reaped the benefits of Plaintiffs and the putative class members' labor by charging others for labor without paying Plaintiffs and putative class members anything. DARP generated

millions of dollars in revenue and payed their officers hundreds of thousands of dollars in annual salary off the backs of Plaintiffs and putative class members.

74.     Hendren profited from that relationship by paying lower wage rates and using threats of incarceration to coerce Plaintiffs and putative class members into performing the type of work many employees would not perform, thus staffing notoriously hard-to-fill positions. Further, Hendren was able to achieve substantial costs savings by avoiding payroll taxes, worker's compensation insurance, or unemployment insurance.

75.     Despite working alongside the other employees, performing identical work, and adhering to the same Company policies, Hendren purports to claim that DARP residents are not employees.

76.     DARP, however, also contends that its residents are not employees. *See* (*DARP Disclaimer of Employment Relationship* [Ex. K]).

77.     Upon information and belief, neither DARP nor Hendren withhold or match the payroll taxes for the Plaintiffs or putative class members required by law. The employer portion of payroll taxes is 7.65%, and an equal amount is also to be withheld and paid from the employee's earnings. Upon information and belief, neither DARP nor Hendren pay unemployment taxes on these employees.

78.     As a result, DARP and Hendren have concocted a scheme in which Plaintiffs and putative class members are subject to the control and direction of the Companies, performing work identical to that performed by other employees, but without anyone paying payroll taxes.

79.     Defendants have orchestrated an extensive network of tax fraud and evasion by classifying Plaintiffs and putative class members as independent contractors, thereby amassing huge sums in ill-gotten tax savings over the years and defrauding the people and State of Arkansas.

80.     After being served with the original Complaint in this matter, Hendren Plastics, Inc. terminated its contractual arrangement with DARP.

81.     Senator Hendren then took to the media, claiming that his company paid DARP for Plaintiffs' and putative class members' work, but that he was not privy to the details of the arrangement between DARP and its residents.

82.     Senator Hendren's claim that he did not know DARP residents worked without pay is unbelievable. In 2014, Arkansas Community Correction withdrew DARP's license to operate as an authorized Transitional Housing Facility because ACC discovered DARP did not pay its residents, including those parolees who worked at Hendren Plastics.

83.     Moreover, DARP readily admits that its revenue is "generated solely through the various employment contracts D.A.R.P. has entered into to provide employment for [its] participants." (*DARP Introduction* [Ex. G]). DARP does not hide that it keeps all the wages earned by its residents, and that information is published in the program's policies and procedures. *See, e.g.,* (*DARP Fees & Costs* [Ex. E]).

84.     Had Senator Hendren looked at any of DARP's program materials, or made any inquiry into why a State department suddenly revoked DARP's license, he would have learned that DARP retained all of the money earned by Plaintiffs and putative class

members. It is simply unbelievable that Senator Hendren would enter into a contract with a convicted meth dealer without doing any investigation into the program.

85.     Senator Hendren knew, should have known, or was willfully ignorant of the fact, that DARP retained all the wages earned by Plaintiffs and putative class members, and that Plaintiffs and putative class members were therefore working for Hendren, making his products, without being paid for their labor.

86.     In any event, even if Senator Hendren personally did not know DARP did not pay its residents, Hendren Plastics knew Plaintiffs and putative class members were slaves. DARP residents routinely complained to Hendren Plastics management about working without pay, and the subject was a topic of frequent complaints and conversation at Hendren Plastics. Hendren Plastics management was aware of the arrangement, and the issue was common knowledge at Hendren Plastics.

87.     As a result, DARP and Hendren together orchestrated a pervasive scheme of slavery in which each entity and their officers profited from DARP's large, coerced labor force.

88.     Hendren, in conjunction with DARP, controlled the working conditions of Plaintiffs and the putative class members.

89.     Hendren, in conjunction with DARP, supervised the work of Plaintiffs and the putative class members.

90.     Hendren, in conjunction with DARP, directed the work of Plaintiffs and the putative class members.

91.    Hendren, in conjunction with DARP, set the work schedules of Plaintiffs and the putative class members.

92.    Hendren, in conjunction with DARP, enforced compliance of Hendren's work rules and policies.

93.    Hendren, in conjunction with DARP, controlled the rates and methods of pay for Plaintiffs and the putative class members, although that pay was kept by DARP, not Plaintiffs and the putative class members.

94.    Hendren, in conjunction with DARP, maintained employee records pertaining to Plaintiffs and the putative class members.

95.    Hendren retained the ability to terminate any DARP resident sent to work at its facility.

### *John Doe Defendants*

96.    The John Doe Defendants are for-profit business operating in Arkansas that, in conjunction with DARP, employed Plaintiffs and putative class members in unskilled labor positions but did not pay them for their work.

97.    The John Doe Defendants, in conjunction with DARP, employed Plaintiffs and the putative class members as employees in the John Doe Defendants' profit-making enterprises. Plaintiffs and the putative class members were not employed to provide valuable community service like picking up trash on the side of the road or painting and repairing public works.

98.    Rather, Plaintiffs and the putative class members worked alongside, and oftentimes in the place of, typical employees hired to produce the John Doe Defendants' product.

99.    Likewise, Plaintiffs and the putative class members were not trained in a trade, but instead performed unskilled labor in demanding, dangerous, and dirty environments.

100.    DARP provided its charges to be exploited by the John Doe Defendants. DARP reaped the benefits of Plaintiffs and the putative class members' labor by collecting all the wages earned by those employees, collectively generating millions of dollars in revenue and paying their officers hundreds of thousands of dollars in annual salary.

101.    The John Doe Defendants profited from that relationship by paying lower wage rates and using threats of incarceration to coerce Plaintiffs and putative class members into performing the type of work many employees would not perform, thus staffing notoriously hard-to-fill positions.

102.    Upon information and belief, despite working alongside the other employees, performing identical work, and adhering to the same Company policies, the John Doe Defendants purport to claim that DARP residents are not employees.

103.    DARP, however, also contends that its residents are not employees. *See* (*DARP Disclaimer of Employment Relationship* [Ex. K]).

104.    Upon information and belief, neither DARP nor the John Doe Defendants withhold or match the payroll taxes for the Plaintiffs or putative class members required by law.

105.   As a result, DARP and the John Doe Defendants have concocted a scheme in which Plaintiffs and putative class members are subject to the control and direction of the Companies, but the Companies all claim they are not responsible for employer tax liability.

106.   Defendants have orchestrated an extensive network of tax fraud and evasion by classifying Plaintiffs and putative class members as independent contractors, thereby amassing huge sums in ill-gotten tax savings over the years.

107.   DARP, acting in concert with the John Doe Defendants, married Plaintiffs' and the putative class members' job performance with their successful "treatment."

108.   As a result, DARP and the John Doe Defendants together orchestrated a pervasive scheme of slavery in which each entity and their officers profited from DARP's large, coerced labor force.

109.   The John Doe Defendants, in conjunction with DARP, controlled the working conditions of Plaintiffs and the putative class members.

110.   The John Doe Defendants, in conjunction with DARP, supervised the work of Plaintiffs and the putative class members.

111.   The John Doe Defendants, in conjunction with DARP, directed the work of Plaintiffs and the putative class members.

112.   The John Doe Defendants, in conjunction with DARP, set the work schedules of Plaintiffs and the putative class members.

113.   The John Doe Defendants, in conjunction with DARP, enforced compliance of the John Doe Defendants' work rules and policies.

114.    The John Doe Defendants, in conjunction with DARP, controlled the rates and methods of pay for Plaintiffs and the putative class members, although only DARP was paid, not Plaintiffs and the putative class members.

115.    The John Doe Defendants, in conjunction with DARP, maintained employee records pertaining to Plaintiffs and the putative class members.

## IV. CLASS ACTION ALLEGATIONS

116.    Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

117.    Plaintiffs brings this action for violation of the Arkansas Constitution, the AMWA, and the Arkansas Human Trafficking Act of 2013 as a class action under Rule 23 of the *Federal Rules of Civil Procedure*. The class is comprised of individuals who were, are, or will be DARP participants from October 23, 2014 until the present, who worked in the State of Arkansas during their time at DARP.

118.    Members of the putative class are so numerous that joinder of all such members is impracticable. The exact size of the putative class is unknown, but may be determined from records maintained by Defendants. Upon information and belief, the class is believed to include more than 100 individuals. Former employees are also included as putative class members.

119.    There are common questions of law and fact applicable to the putative class with respect to liability, relief, and anticipated affirmative defenses. Common questions of law and fact include, but are not limited to, whether Defendants failed to pay Plaintiffs and putative class members minimum wage for all hours worked; whether Defendants'

compensation policies and practices are illegal; whether injunctive relief is available to force Defendants into compliance, whether Defendants have acted willfully or in good faith; whether Defendants subjected Plaintiffs and the putative class to involuntary servitude; whether Plaintiffs and members of the putative class are entitled to liquidated damages, penalties, and attorneys' fees and costs; and whether Defendants have complied with the AMWA's record-keeping obligations.

120.    Plaintiffs are typical of the putative class. Like all other putative class members, Plaintiffs were subject to Defendants' common policy and practice of not paying them for all compensable work to which they were entitled under Arkansas law.

121.    Plaintiffs will fairly and adequately protect the interest of the putative class. They have no conflicts with putative class members and have suffered the same injury as members of the putative class. Plaintiffs' counsel possess the requisite resources and experience in class action litigation to adequately represent Plaintiffs in prosecuting the claims here.

122.    Defendants have acted or refused to act on grounds generally applicable to the putative class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the putative class. Plaintiffs and members of the putative class are entitled to injunctive relief to end Defendants' common and uniform practice of failing to properly compensate them for all hours worked.

123.    The questions of law and fact common to Plaintiffs and members of the putative class predominate over any question affecting only individual class members,

and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## V. COUNT I:
### AMWA: FAILURE TO PAY MINIMUM WAGE

124.    Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

125.    At all relevant times, Plaintiffs and members of the putative classes were entitled to the rights, protections, and benefits provided under the AMWA.

126.    At all relevant times, Plaintiffs and members of the putative class were "employees" of Defendants, as defined by Ark. Code Ann. § 11-4-203(3).

127.    At all relevant times, Defendants were the "employers" of Plaintiffs and members of the putative classes, as defined by Ark. Code Ann. § 11-4-203(4).

128.    Ark. Code Ann. § 11-4-210(a) provides that "beginning October 1, 2006, every employer shall pay each of his or her employees wages at the rate of not less than six dollars and twenty-five cents ($6.25) per hour except as otherwise provided in this subchapter. Beginning January 1, 2015, every employer shall pay his or her employees wages at the rate of not less than seven dollars and fifty cents ($7.50) per hour, beginning January 1, 2016, the rate of not less than eight dollars ($8.00) per hour, and beginning January 1, 2017, the rate of not less than eight dollars and fifty cents ($8.50) per hour, except as otherwise provided in this subchapter." Ark. Code Ann. § 11-4-210(a)(1)-(2).

129.    At all relevant times, Defendants, pursuant to their policies and practices, failed and refused to compensate Plaintiffs for work performed at the rate required by Ark. Code Ann. § 11-4-210.

130.    Plaintiffs and members of the putative classes are entitled to compensation for all hours worked up to 40 per work week at the minimum wage set by Arkansas law. From October 1, 2006 until December 31, 2014, that minimum rate was $6.25 per hour. From January 1, 2015 until December 31, 2015, that minimum rate was $7.50 per hour. From January 1, 2016 until December 31, 2016, that minimum rate was $8.00 per hour. Since January 1, 2017, that minimum rate is $8.50 per hour.

131.    Defendants have willfully violated and continue to violate the AMWA by failing to pay putative class members for all hours worked up to 40 per work week at least the minimum rate prescribed therein.

132.    Defendants have failed and continue to fail to make, keep, and preserve records with respect to each of its employees sufficient to determine their wages, hours, and other conditions and practices of employment, in violation of Ark. Code Ann. § 11-4-217.

133.    Defendants have willfully violated and continue to violate the above provisions by failing to pay putative class members for all hours worked up to 40 per work week at least the minimum rate prescribed therein.

134.    Plaintiffs and members of the putative classes have sustained damages as a result of Defendants' violation of the AMWA.

135.    Defendants' violations entitle Plaintiffs and members of the putative class to liquidated damages pursuant to Ark. Code Ann. § 11-4-218(a)(2) in an amount equal to Plaintiffs' and the putative class' compensatory damages.

136.    Plaintiffs and members of the putative classes are entitled to an award of attorneys' fees and costs pursuant to Ark. Code Ann. § 11-4-218(a)(1)(B)(ii).

137.    Defendants, as joint employers, are jointly and severally liable to Plaintiffs and the putative class members for unpaid wages, an equal amount in liquidated damages, interest, expenses, attorneys' fees, and costs.

## VI. COUNT II:
## AMWA: FAILURE TO PAY OVERTIME

138.    Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

139.    At all relevant times, Plaintiffs and members of the putative classes were entitled to the rights, protections, and benefits provided under the AMWA.

140.    At all relevant times, Plaintiffs and members of the putative class were "employees" of Defendants, as defined by Ark. Code Ann. § 11-4-203(3).

141.    At all relevant times, Defendants were the "employers" of Plaintiffs and members of the putative classes, as defined by Ark. Code Ann. § 11-4-203(4).

142.    Ark. Code Ann. § 11-4-211(a) provides that "no employer shall employ any of his or her employees for a work week longer than forty (40) hours unless the employee receives compensation for his or her employment in excess of the hours above specified

at a rate not less than one and one-half (1 ½) times the regular rate of pay at which he or she is employed."

143.    At all relevant times, Defendants, pursuant to their policies and practices, failed and refused to compensate Plaintiffs for work performed at the rate required by Ark. Code Ann. § 11-4-211.

144.    Plaintiffs and members of the putative classes are entitled to compensation for all hours worked in excess of 40 per work week at a rate not less than one-and-a-half times their regular rate of pay.

145.    Defendants have willfully violated and continue to violate the AMWA by failing to pay putative class members for all hours actually worked at the rate prescribed therein.

146.    Defendants have failed and continue to fail to make, keep, and preserve records with respect to each of its employees sufficient to determine their wages, hours, and other conditions and practices of employment, in violation of Ark. Code Ann. § 11-4-217.

147.    Defendants have willfully violated and continue to violate the above provisions by failing to pay one-and-a-half times the regular rate of pay for compensable work in excess of 40 hours in a work week.

148.    Plaintiffs and members of the putative classes have sustained damages as a result of Defendants' violation of the AMWA.

149.    Defendants' violations entitle Plaintiffs and members of the putative class to liquidated damages pursuant to Ark. Code Ann. § 11-4-218(a)(2) in an amount equal to Plaintiffs' and the putative class' compensatory damages.

150.    Plaintiffs and members of the putative classes are entitled to an award of attorneys' fees and costs pursuant to Ark. Code Ann. § 11-4-218(a)(1)(B)(ii).

151.    Defendants, as joint employers, are jointly and severally liable to Plaintiffs and the putative class members for unpaid wages, liquidated damages, interest, expenses, attorneys' fees, and costs.

## VII. COUNT III:
### INVOLUNTARY SERVITUDE IN VIOLATION OF ARK. CONST. ART. 2, § 27

152.    Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

153.    At all relevant times, Plaintiffs and members of the putative classes were entitled to the rights, protections, and benefits provided under the Arkansas Constitution, including Article 2, § 27's prohibition on slavery and involuntary servitude.

154.    As explained above, Defendants held Plaintiffs and putative class members in involuntary servitude by falsely holding themselves out as a "drug and alcohol recovery program," forcing them to work long hours under harsh conditions, without pay, and under the constant threat of being sent to jail.

155.    DARP provided its charges to be exploited by Hendren and the John Doe Defendants. DARP reaped the benefits of Plaintiffs and the putative class members' labor by keeping all of the money earned by those employees, collectively generating millions

of dollars in revenue and paying their officers hundreds of thousands of dollars in annual salary.

156.    Hendren and the John Doe Defendants profited from that relationship by reducing its labor costs, using threats of incarceration to coerce Plaintiffs and putative class members into performing the type of work many employees would not perform, and avoiding payroll taxation, workers compensation expenses, and unemployment insurance.

157.    As a result, DARP, Hendren, and the John Doe Defendants together orchestrated a pervasive scheme of slavery in which each entity and their officers profited from DARP's large, coerced labor force, and are therefore jointly and severally liable for the violations complained of herein.

158.    As such, Defendants directed, assisted, conspired, and acted in concert with each other and perpetuated a system of involuntary servitude prohibited by the Arkansas Constitution.

159.    As a direct and proximate result of these actions, Plaintiffs and putative class members have suffered economic losses.

160.    As a direct and proximate result of these actions, Plaintiffs have suffered pain and suffering.

161.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered lost income and lost employment opportunities.

162.    Plaintiffs and putative class members are entitled to recover damages in an amount to be proven at trial, including attorneys' fees and costs, and punitive damages.

## VIII. COUNT IV:
### VIOLATION OF ARK. CODE ANN. § 5-18-101, ET SEQ.
### ARKANSAS HUMAN TRAFFICKING ACT OF 2013

163.    Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

164.    The Arkansas Human Trafficking Act of 2013 is designed to prevent trafficking of individuals for commercial sexual activity and involuntary servitude. Ark. Code Ann. § 5-18-101, *et seq.*

165.    The purpose of the Act is to protect vulnerable members of society, including those individuals compelled to engage in unwanted conduct or labor, from individuals and institutions more powerful than themselves.

166.    At all relevant times, Plaintiffs and putative class members were subject to the protections of the Arkansas Human Trafficking Act.

167.    Under the Arkansas Human Trafficking Act of 2013, a person commits the offense of trafficking of persons if he or she knowingly recruits, harbors, transports, obtains, entices, solicits, isolates, provides, or maintains a person knowing that the person will be subjected to involuntary servitude. Ark. Code Ann. § 5-18-103(a)(1)

168.    In addition, a person commits the offense of trafficking of persons if he or she knowingly benefits financially or by receiving anything of value from participating in a venture under section 5-18-103(a)(1). Ark. Code Ann. § 5-18-103(a)(2).

169.    Likewise, a person commits the offense of trafficking of persons if he or she knowingly subjects a person to involuntary servitude. Ark. Code Ann. § 5-18-103(a)(3).

170. "Involuntary servitude" means the inducement or compulsion of a person to engage in labor or services by means of a scheme, plan, or pattern of behavior with a purpose to cause a person to believe that if he or she does not engage in labor or services, he or she or another person will suffer serious physical injury or physical restraint. Ark. Code Ann. § 5-18-102(5).

171. "Involuntary servitude" also means the inducement or compulsion of a person to engage in labor or services by means of abuse or threatened abuse of the legal process, or the taking of another person's personal property or real property. Ark. Code Ann. § 5-18-102(5).

172. Any individual who is a victim of human trafficking within the meaning of Ark. Code Ann. § 5-18-103 has a private right of action to recover actual damages, compensatory damages, treble damages if the defendants' acts were willful and malicious, punitive damages, injunctive relief, or any other appropriate relief. Ark. Code Ann. § 16-118-109.

173. As explained above, Defendants held Plaintiffs and putative class members in involuntary servitude by falsely holding themselves out as a "drug and alcohol recovery program," forcing them to work long hours under harsh conditions, without pay, and under the constant threat of being sent to jail.

174. DARP provided its charges to be exploited by Hendren and the John Doe Defendants. DARP reaped the benefits of Plaintiffs and the putative class members' labor by keeping all the money earned by those employees, collectively generating millions of

dollars in revenue and paying their officers hundreds of thousands of dollars in annual salary.

175.   DARP, Hendren, and the John Doe Defendants knowingly recruited, harbored, transported, obtained, enticed, solicited, isolated, provided, or maintained Plaintiffs and putative class members knowing that Plaintiffs and putative class members would be subjected to involuntary servitude.

176.   DARP benefited financially and received things of value from participating in Plaintiffs' and putative class members' involuntary servitude.

177.   Hendren and the John Doe Defendants profited from that relationship by paying lower wage rates, using threats of incarceration to coerce Plaintiffs and putative class members into performing the type of work many employees would not perform, and fraudulently saving money by not paying payroll taxes.

178.   Hendren and the John Doe Defendants benefited financially and received things of value from participating in Plaintiffs' and putative class members' involuntary servitude, including but not limited to, a captivated work force to which the most undesirable jobs could be assigned and avoiding necessary tax obligations.

179.   As a result, DARP, Hendren, and the John Doe Defendants together orchestrated a pervasive scheme of illegal human trafficking in which each entity and their officers profited from DARP's large, coerced labor force, and are therefore jointly and severally liable for the violations complained of herein.

180.   As a direct and proximate result of these actions, Plaintiffs and putative class members have suffered economic losses.

181.    As a direct and proximate result of these actions, Plaintiffs have suffered pain and suffering.

182.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered lost income and lost employment opportunities.

183.    Plaintiffs and putative class members are entitled to recover damages in an amount to be proven at trial, including attorneys' fees and costs, and punitive damages.

184.    Defendants' conduct of forcing Plaintiffs and putative class members into involuntary servitude was done willfully and maliciously, and Plaintiffs and putative class members are therefore entitled to treble damages.

185.    Defendants' violation of the Arkansas Human Trafficking Act entitles Plaintiffs and putative class members to punitive damages in an amount to be proven at trial.

## IX. PRAYER FOR RELIEF

186.    WHEREFORE, Plaintiffs, on behalf of themselves and all members of the putative class, respectfully request this Court:

a.    Certify this action as a class action on behalf of the proposed class pursuant to Ark. R. Civ. P. 23, defined as:

All individuals who were, are, or will be DARP participants from October 23, 2014 until the present, and worked in Arkansas during their time at DARP.

b.    Designate Plaintiffs as Representative of the Class;

c.    Appoint Holleman & Associates, P.A. as class counsel;

d.      Enter a declaratory judgment that the practices complained of herein are unlawful under Arkansas law;

e.      Enter a permanent injunction, restraining and preventing Defendants from withholding the compensation that is due to Plaintiffs, from retaliating against any Plaintiff for taking part in this action, and from further violation of their rights under the law;

f.      Enter an order for a complete and accurate accounting of all the compensation to which Plaintiffs and the putative class members are entitled;

g.      Enter judgment against Defendants for an amount equal to the unpaid back wages of Plaintiffs and others similarly situated at the applicable minimum wage and overtime rates. The damages continue for a period from three (3) years prior to the filing of this Complaint to the date of trial;

h.      Enter judgment against Defendants for liquidated damages equal to the amount of compensatory damages;

i.      Enter judgment against Defendants for treble damages;

j.      Find that Defendants' violations of the AMWA were willful;

k.      Find that Defendants' violations of the Arkansas Human Trafficking Act of 2013 were willful and malicious;

l.      Grant Plaintiffs all recoverable costs, expenses, and attorneys' fees incurred in prosecuting these claims, together with all applicable interest and punitive damages; and

m.    Grant Plaintiffs all such further relief as the Court deems just and appropriate.

## X. JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

HOLLEMAN & ASSOCIATES, P.A.
1008 West Second Street
Little Rock, Arkansas 72201
Tel. 501.975.5040
Fax 501.975.5043


Respectfully Submitted,

John Holleman, ABN 91056
jholleman@johnholleman.net
Timothy A. Steadman, ABN 2009113
tim@johnholleman.net
Jerry Garner, ABN 2014134
jerry@johnholleman.net

## CERTIFICATE OF SERVICE

I, Timothy A. Steadman, hereby certify that a true and correct copy of the foregoing document was served via CM/ECF on March 9, 2018, which will send notice to all counsel of record.

By: _____

Timothy A. Steadman