**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**


**MARK FOCHTMAN, et al., Individually,**
**and on Behalf of All Others Similarly Situated**          **PLAINTIFFS**

**V.**          **CASE NO. 5:18-cv-5047**

**DARP, INC. and HENDREN PLASTICS, INC.**          **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Presently before the Court are three ripe motions for summary judgment. All three motions ask the Court to decide as a matter of law the following two legal questions: (1) whether Plaintiffs and the class members they represent are employees under the Arkansas Minimum Wage Act ("AMWA" or "Act") and (2) whether the Defendants qualify as employers under the Act. For the reasons set forth below, the two questions are answered in the affirmative, and, consequently, Defendant DARP, Inc.'s ("DARP") Motion for Summary Judgment (Doc. 89) is **DENIED**, and Defendant Hendren Plastics, Inc.'s ("Hendren") Motion for Summary Judgment (Doc. 93) is also **DENIED**. Plaintiffs' Motion for Summary Judgment (Doc. 87) is **GRANTED IN PART** with respect to the above legal questions and **DEFERRED IN PART** as to Plaintiffs' request that the Court determine the total amount of damages owed by the Defendants.

## I.     BACKGROUND

Plaintiff Mark Fochtman and a second individual, Shane O'Neal, originally filed this matter in the Circuit Court of Benton County, Arkansas, on October 23, 2017. At that time, the defendants in the lawsuit included DARP, a drug and alcohol recovery facility in Decatur, Arkansas; Hendren, a plastics factory in Gravette, Arkansas; CAAIR, Inc.

("CAAIR"), a drug and alcohol recovery facility located near Jay, Oklahoma; and Simmons Foods, Inc. ("Simmons"), a business that, among other things, operates poultry processing plants and chicken farms in Arkansas and Oklahoma. On November 6, 2017, Simmons removed the case to this Court, asserting federal jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2).

The plaintiffs initially disagreed about whether removal was proper and federal jurisdiction was appropriate, but at some point, they were persuaded that CAFA's jurisdictional requirements had been satisfied as of the time of removal, and their motion to remand was deemed moot. *See* Doc. 2, p. 4. All the parties agreed—eventually—that the case should be severed into two separate lawsuits, as there appeared to be two putative classes asserted in the complaint. The first class included individuals who were ordered by state drug courts to reside at CAAIR, which, in turn, required its residents to work at Simmons's poultry processing plant and/or chicken farm; and the other class included individuals who were ordered to reside at DARP, which, in turn, required its residents to work at Hendren's plastics factory. Simmons asked the Court to transfer the Simmons/CAAIR claims to the Northern District of Oklahoma, where similar claims were already pending, and Hendren and DARP asked the Court to remand the Hendren/DARP claims to state court pursuant to an exception to CAFA jurisdiction. The plaintiffs opposed both requests.

In a memorandum opinion and order issued on February 27, 2018, the Court granted Simmons's motion to transfer the Simmons/CAAIR putative class action claims to the Northern District of Oklahoma and denied Hendren and DARP's joint request to remand the Hendren/DARP claims to state court. *See id.* at 17. The Court directed Mr.

Fochtman to submit an amended complaint containing only claims against Hendren and DARP, and he did so on March 9, 2018, under the instant case number, 5:18-CV-5047. (Doc. 1).

The Plaintiffs identified in the Complaint are individuals who, at one time, faced criminal charges related to substance abuse. Arkansas drug courts offered them the opportunity to participate in DARP's residential drug and alcohol recovery program in lieu of punishment in the criminal justice system. They knew that if they chose to enter DARP but did not complete DARP's program requirements, they would be returned to drug court to face the prospect of prison time.

The Complaint alleges that the Defendants qualify as joint employers under the AMWA and that they violated the law by failing to pay DARP's residents minimum-wage and overtime compensation for the hours they worked at Hendren's plastics factory. DARP provided each resident with bed space at one of its two sixty-bed facilities in Decatur, as well as meals, clothing and basic hygiene supplies (if needed), and transportation to and from a job at Hendren's for-profit plastics factory. DARP and Hendren entered into a Contract Labor Agreement (Doc. 90-21) that provided that DARP would transport its residents to Hendren to work daily shifts at the factory at a flat rate per hour. The two companies also negotiated a rate for overtime compensation for these workers. According to their agreement, the two companies entered into this business relationship to further their twin goals of providing "a reliable work force" for Hendren that would show up to work on time, every day, and of demonstrating to DARP's residents the

value of sobriety through the ethic of hard work. *Id.*[1]  Hendren did not pay the workers directly.   Instead, Hendren would keep track of their hours using the same timeclock system that the regular employees used, and then Hendren would forward the total number of hours worked to DARP.   DARP would multiply those hours by the hourly rates DARP and Hendren had agreed to ahead of time, and then DARP would provide Hendren with an invoice.   With the invoice in hand, Hendren would cut a lump-sum check to DARP for the residents' labor.[2]

All residents signed a document entitled "Admission Agreement" upon their entry to DARP that clearly informed them they would not be paid wages for their work at the factory, "as the money earned goes toward operation of the D.A.R.P. Foundation," (Doc. 90-6), but that they might receive a gratuity/stipend from DARP if DARP determined they had successfully completed the program.

After the Complaint was filed, Hendren and DARP each filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).   The Court denied both motions in an order entered on June 27, 2018. (Doc. 35).   Several months later, the Court considered Plaintiffs' motion for class certification, filed on September 17, 2018.   The motion was vigorously opposed by both Defendants.   In a memorandum opinion and order issued on January 31, 2019 (Doc. 53), the Court certified a class composed of:

---

[1] DARP's former Director of Operations testified that he would "pitch" DARP's contract labor model to prospective employers like Hendren by explaining they would enjoy cost savings associated with not having to pay employment taxes and worker's compensation insurance for DARP's workers.  (Doc. 90-10, p.16, Dep. of Glen Whitman).

[2] Hendren characterizes these lump-sum payments—which did not include withholdings for payroll taxes and unemployment and worker's compensation insurance—as "wages," but Plaintiffs characterize them as payments "for providing a workforce."  *See* Doc. 98, pp. 7–8.

All individuals who were DARP participants at any time from October 23, 2014, until the present, and who worked for Hendren Plastics, Inc. in the State of Arkansas during their time at DARP.

Following the Court's order on class certification, Hendren and DARP filed petitions at the Eighth Circuit on February 13 and 14, respectively, seeking to appeal the Court's class certification decision. However, by March 14, both petitions had been denied. *See* Doc. 64-1. Discovery in the case continued, and on June 21, 2019, Plaintiffs, DARP, and Hendren each filed separate motions for summary judgment. Plaintiffs' Motion (Doc. 87) asks the Court to find that DARP is an employer, that Hendren is a joint employer along with DARP, and that the Plaintiffs and class members were, during the relevant class period, employees as defined by the AMWA. Plaintiffs also argue there is no genuine dispute of fact that Defendants failed to pay appropriate minimum-wage and overtime compensation and that the precise amount owed is not in dispute.

DARP and Hendren take the opposite position in their Motions for Summary Judgment (Docs. 89, 93). They argue the Court should find as a matter of law that DARP and Hendren are not employers under the AMWA and that the class members were not employees. Hendren also offers a couple of affirmative defenses, namely, that even if an employment relationship existed here, the class members validly assigned their wages to DARP or, in the alternative, DARP validly withheld their wages pursuant to court orders issued by Arkansas drug courts.

## II.     LEGAL STANDARD

### A.     Summary Judgment

A party moving for summary judgment must establish both the absence of a genuine dispute of material fact and its entitlement to judgment as a matter of law. *See*

Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999). The same standard applies where, as here, the parties have filed cross-motions for summary judgment. When no material facts are in dispute, "summary judgment is a useful tool whereby needless trials may be avoided, and it should not be withheld in an appropriate case." *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978). Each motion should be reviewed in its own right, however, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1998). In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### B.    Classifying a Worker as an Employee

Both the Fair Labor Standards Act ("FLSA") and the AMWA define an "employee" as "any individual employed by an employer" and an "employer" as anyone "acting directly or indirectly in the interest of an employer in relation to an employee." *Compare* Ark. Code Ann. § 11-4-203, *with* 29 U.S.C. § 203. In addition, Arkansas Administrative Code Title 010.14.1-112 provides that the Arkansas Department of Labor may rely upon federal precedent established by the FLSA in interpreting the AMWA. Courts regularly use FLSA precedent to interpret the AMWA. *See Karlson v. Action Process Serv. & Private*

*Investigation, LLC*, 860 F.3d 1089, 1092 n.3 (8th Cir. 2017); *Harris v. Express Courier Int'l*, 2017 WL 5606751, at *4 (W.D. Ark. Nov. 21, 2017).

The Supreme Court has instructed lower courts to broadly interpret the meaning of "employee" under the FLSA. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992); *see also* Ark. Code Ann. § 11-4-204 (stating that the AMWA should be "liberally construed in favor of its purpose"). Furthermore, the test for employment under the FLSA hinges on the economic reality of the worker's situation. *Ash v. Anderson Merchandisers, LLC*, 799 F.3d 957, 961 (8th Cir. 2015) (citing *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985)). Under the economic-reality test, courts look at the total circumstances of the economic relationship between the parties, including such factors as the "alleged employers' right to control the nature and quality of their work, the employers' right to hire, or fire, or the source of compensation for their work." *Id.* at 961.

## C.    Classifying a Business as an Employer or Joint Employer

The term "employer" includes any individual, partnership, association, corporation, or person "acting directly or indirectly in the interest of an employer in relation to an employee," provided that the employer has at least four employees. Ark. Code Ann. § 11-4-203(4)(A)–(B). When determining whether an entity is liable as an employer, courts consider the following three factors: (1) control in hiring and firing employees, (2) control in the manner in which work is performed, and (3) the fixing of employee wages. *Dole v. Cont'l Cuisine, Inc.*, 751 F. Supp. 799, 802–03 (E.D. Ark. 1990) (citing *Wirtz v. Pure Ice Co.*, 322 F.2d 259 (8th Cir. 1963)).

In joint-employer cases, the relevant inquiry is whether the two employers "are acting entirely independently of each other and are completely disassociated with respect to the employment of a particular employee . . . ." 010 Ark. Code R. § 14.1-110(A) (mirroring FLSA regulations at 29 C.F.R. § 791.2(a)). The AMWA regulations further provide that if an employee performs work that simultaneously benefits two or more employers, a joint-employment relationship exists, such as:

> 1. Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or

> 2. Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

> 3. Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

010 Ark. Code R. § 14.1-110(B) (mirroring FLSA regulations at 29 C.F.R. § 791.2(b)).

## III. DISCUSSION

### A. Employee and Employer/Joint-Employer Status Under the AMWA

The Court has previously had an opportunity to consider—although not on a dispositive basis—whether the former residents of DARP qualify as employees and whether DARP and Hendren qualify as employers under the AMWA. *See* Doc. 35, pp. 4–7, Memorandum Opinion and Order (denying dismissal of Plaintiffs' minimum-wage and overtime compensation claims under Rule 12(b)(6)); Doc. 53, Memorandum Opinion and Order at 9–10 (granting Plaintiffs' motion for class certification). Now that discovery is complete and these issues have been presented to the Court on summary judgment, the Court observes that the facts material to the analysis have not changed since the

issues were first presented at the Rule 12 dismissal stage.  The applicable law is also the same.

Determining whether a worker qualifies as an employee under the AMWA depends on the economic reality of the worker's situation.  Ordinarily, the issue of classification presents itself when an employee contends he was inappropriately labeled an independent contractor, but the economic reality of his work situation reveals that he was really an employee, entitled to minimum-wage and overtime compensation under the law.  The issue in the instant case is different than the usual situation because the workers here were not directly paid any cash wages for their labors, and the Defendants contend they were not entitled to receive wages at all.  Defendants believe that since the class members were informed at the time they entered the DARP program that they were not entitled to cash wages and would not receive them, and since they all signed the same paperwork acknowledging they were not employees, they voluntarily gave up any entitlement they might have otherwise had to employee status.

The Supreme Court has decided the question of whether the minimum-wage and overtime requirements of the FLSA apply to workers who do not consider themselves to be employees or have affirmatively disclaimed any right to receive cash wages.   The case of *Tony and Susan Alamo Foundation v. Secretary of Labor* involved a nonprofit religious organization that "derive[d] its income largely from the operation of a number of commercial businesses, which include[d] service stations, retail clothing and grocery outlets, hog farms, roofing and electrical construction companies, a recordkeeping company, a motel, and companies engaged in the production and distribution of candy." 471 U.S. 290, 292 (1985).  The Foundation's businesses were staffed by workers known

as "associates."  These associates were former "drug addicts, derelicts, or criminals" who claimed they had turned their lives around as a result of the Alamos' ministry.  *Id.*  Many associates testified that they considered themselves to be volunteers when they worked for the Foundation's businesses, rather than employees, because they "expected no compensation for their labors."  *Id.* at 300.  Indeed, one associate testified "that she did not work for material rewards" and that none of the other workers expected monetary compensation either.  *Id.*  This same associate also stated that she considered the work she did to be personally beneficial and "part of her ministry."  *Id.* at 300–01.

The Court observed that "[a]n individual who, 'without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit,' is outside the sweep of the Act."  *Id.* at 295 (quoting *Walling v. Portland Terminal Co.,* 330 U.S. 148, 152 (1947)).  From this, the Court identified a test for determining whether a self-avowed volunteer—like an Alamo Foundation associate—should nonetheless be considered an employee under the FLSA. If the worker expected to receive compensation in the form of in-kind benefits in exchange for their work, then the worker was an employee under the law, regardless of the worker's subjective expectation of cash wages.  *Id.* at 301.  The Court concluded that in-kind benefits were nothing more than "wages in another form," *id.*, and the testimony in the case revealed that the Alamo associates "did expect the Foundation to provide them with food, shelter, clothing, transportation and medical benefits" and were utterly dependent for periods of time on those benefits, *id.* at 293 (internal quotation and citation omitted).

But what of the fact that the associates expected no monetary compensation for their work and "vehemently protested coverage under the Act?"  *Id.* at 302.  The Court

explained that the associates' opinions on their classification status were immaterial to the classification inquiry, since "the purposes of the Act require that it be applied even to those who would decline its protections." *Id.* On this point, the Court noted:

> If an exception to the Act were carved out for employees willing to testify that they performed work "voluntarily," employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act.

*Id.*

Turning now to the facts of the instant case, the Court agrees with Hendren that "[t]he receipt of in-kind benefits by a worker is not dispositive of whether one who provides services to another is an employee." (Doc. 94, p. 10). The dispositive question is whether a worker expects to receive and actually receives in-kind benefits in exchange for work. If so, the worker is not a volunteer but is "paid" for his labor with, at least, food, housing, clothing, and transportation. In other words, if the economic reality of the worker's situation is that he is an employee, then he is entitled to all the rights and protections of an employee under the law, regardless of whether he rejects that classification and believes he is not entitled to cash wages.

Here, the class members were entirely dependent on DARP for all necessities of life for anywhere from six months to a year at a time. They labored in a privately-owned, for-profit plastics factory located near DARP, and they performed that work as well as other duties required of them by DARP in exchange for room, board, and other necessities. The Admission Agreement that all the DARP residents signed—and that the Defendants now urge the Court to enforce to the residents' detriment—confirms that the cash wages they would have otherwise earned for their labor at Hendren were intended to pay for the in-kind services that DARP provided them. The relevant portion of the Admission Agreement states:

I understand that I will be furnished room and board, clothing, and other necessities. I understand that participants of the D.A.R.P. Foundation receive no pay while in the program and that the money earned goes toward operation of the D.A.R.P. Foundation. This includes all overtime accrued while working and participating at D.A.R.P., for which there will be no compensation.

(Doc. 90-6). *See also* Doc. 90-29, DARP's "Fees and Costs Memo" ("Policy: It is the D.A.R.P. Foundation's policy to never charge participant's [sic] any fees or costs; however, participants are expected to work at full-time jobs knowing they will not receive any immediate financial compensation for their work. *Participants understand that the money is going to the D.A.R.P. Foundation to pay the operating expense of day-to-day operations . . . .*" (emphasis added)).

Accordingly, the Court finds that the class members were paid for their labor not with cash, but with "wages in another form," as the *Alamo* Court put it. 471 U.S. at 301. Those in-kind benefits they received included a bed to sleep in, the option to participate in AA or NA meetings, transportation to and from the job that DARP arranged for them, "healthy meals at no cost," and "basic necessities of hygiene supplies to include toothpaste, shampoo, toothbrushes, razors, etc. at no cost." *Id.* Under *Alamo*, the class members in this case were employees. They were therefore entitled to receive minimum-wage and overtime compensation due to the economic reality of their situation and the level of control DARP and Hendren had over their work. DARP had the right to control the nature and quality of the work they performed at the for-profit companies DARP contracted with to provide steady labor. DARP assigned residents "to job sites . . . based on need and availability," (Doc. 100, p. 7); transported the class members to and from their shifts each day, which assured the workers' prompt and daily attendance, *id.* at 19; and possessed the power to dismiss the workers from the program if they were unable to work, *id.* at 3. Pursuant to the Contract Labor Agreement DARP entered into with

Hendren, the two companies fixed the hourly rates of pay for both the regular and overtime work that the class members performed.  *Id.* at 18. [3]

In view of the undisputed facts set forth above regarding DARP's control over the class members' labor, DARP is clearly an employer under the AMWA.  As for Hendren, it meets the textbook definition of a joint employer. Both DARP and Hendren worked together to assure that DARP's residents were supplied to Hendren based on Hendren's employment needs, and the two companies mutually agreed upon the residents' hourly and overtime rates of pay.[4]  The companies agreed to share the workers' services to their mutual benefit.  They also shared control over the workers' daily duties, since DARP assigned them to work certain shifts at Hendren, and Hendren provided all tools, supplies, and training to the workers.  Finally, the companies shared the ability to hire and fire

---

[3] DARP and Hendren disagree that *Alamo* is dispositive of the classification issue and attempt to distinguish the case in a variety of ways, none of which is persuasive.  They also urge the Court to consider two other cases from outside the Eighth Circuit, both of which held that the workers in those cases were not entitled to cash wages. One of the cases is an unpublished opinion from the Southern District of New York, *Vaughn v. Phoenix House New York, Inc.*, 2019 WL 568012 (S.D.N.Y. Feb. 12, 2019); and the other is a Ninth Circuit opinion, *Williams v. Strickland*, 87 F.3d 1064, 1067 (9th Cir. 1996).  The district court's opinion in *Vaughn* is inapplicable because the case relies on facts that are materially different from those present here. And the Court has already explained in an earlier opinion why *Williams* is distinguishable from the facts in the case at bar. *See* Doc. 35, pp. 6–7.

[4] DARP's Director of Operations, Glen Whitman, testified that he would negotiate different rates of pay for DARP workers depending on which local business with which he was dealing.  Mr. Whitman explained that he would first ask the business what rate it was paying its regular workers, and then he would offer a rate of pay for DARP's workers that was "at or below" the business's regular rate.  (Doc. 90-10, pp. 16–17).  He would also make the business aware that it would receive a cost savings by using DARP's labor force by avoiding paying payroll taxes and worker's compensation insurance for all DARP workers (since DARP believed the workers were not employees under the law). *Id.* at 17. Accordingly, DARP negotiated different rates for labor with different local businesses, depending on the rate necessary to undercut the amount the business paid its regular employees.  *Id.* at 16 (comparing the hourly rate DARP negotiated with Hendren to the rate it negotiated with a different local business, American Air Filters).

DARP's residents. *See* Doc. 90-21, "Contract Labor Agreement" ("If an individual does not have the work ethic or the proper attitude to be an asset to your business[,] [DARP] would be glad to replace them, providing we have someone available. (We receive individuals on a weekly basis)."); Doc. 100, p. 20 (admitting that "Hendren had the ability to inform DARP that it did not want a DARP resident to work at Hendren").

Hendren claims in its brief in support of summary judgment that "[u]nlike the *Alamo* case, Hendren Plastics was not involved in a scheme to obtain low-cost labor for an indefinite period in an effort to obtain a competitive advantage—a key consideration in the passage of the FLSA." (Doc. 94, p. 18). The evidence proves otherwise. Hendren's contractual dealings with DARP generated a captive workforce that Hendren paid *less* than its entry-level employees and *significantly less* than workers Hendren periodically sought from temporary employment agencies.[5] Hendren also benefited by avoiding the expense and administrative costs involved in paying DARP's workers' Social Security taxes, Medicare taxes, federal and state unemployment insurance, and worker's

---

[5] DARP and Hendren admit that Hendren paid DARP $9.00 per hour (which increased to $9.20 at some point during the relevant class period) for DARP's residents' regular, hourly work. (Doc. 100, p. 26; Doc. 102, p. 1). Hendren's Office Manager, Lori Martinez, stated in her affidavit that Hendren paid DARP $13.50 an hour (which increased to $13.80 per hour at some point during the relevant class period) for DARP's residents' overtime work. (Doc. 95-4, pp. 1–2). Though the above pay rates exceed what a minimum-wage employee would be paid, Ms. Martinez admitted that non-DARP employees working at Hendren at the very same jobs were paid $10.00 per hour for regular, hourly work. *Id.* at 3. This means Hendren paid DARP workers anywhere from $0.80 to $1.00 per hour *less* than non-DARP employees for the same work. In addition, Hendren admits that it relied on temporary hiring agencies to provide members of its workforce and would pay one particular agency a rate of $13.70 per hour for each temporary employee's labor. (Doc. 100, pp. 26–27; Doc. 102, p. 1).

compensation insurance.[6]   In other words, Hendren saved money by hiring DARP residents, who, in turn, displaced private-sector workers Hendren would have ordinarily paid a higher rate of pay (along with mandatory state and federal taxes and insurance withholdings). [7]

As for DARP, its residents directly competed with private citizens in the Arkansas labor market for employment at Hendren, and DARP directly competed with temporary employment agencies supplying such a workforce.  The undisputed facts show that DARP provided local businesses like Hendren with a workforce paid at a much cheaper rate than the employment agencies provided.   This was because DARP negotiated rates of pay for their residents' labor that profited DARP *and* the local businesses, and by entering into such contracts with DARP, the businesses could avoid paying employment taxes and making state and federal employment insurance withholdings.

DARP suggests that turning a blind eye to its violations of the AMWA would actually benefit Arkansas and satisfy "sound public policy."  (Doc. 91, p. 24).  In making

---

[6] While Hendren admits it "did not withhold and remit payroll taxes," it shifts the blame to DARP for this omission, arguing that DARP *could have paid* those taxes with the funds Hendren supplied it for class members' labor, if DARP had chosen to do so.  (Doc. 100, p. 25).

[7]  Although Hendren takes the position now that it had "more challenges with DARP participants than it did with its employees," (Doc. 100, p. 20), it admits that it only requested the termination of *three* DARP residents over a three-year period. (Doc. 100, pp. 23–24).   Despite this fact, Hendren claims it considered DARP workers "less desirable" than both its regular and temporary employees, (Doc. 95, p. 10), and believes DARP workers "[did] not have a very good work ethic." (Doc. 100, p. 14).  Other negative descriptors of the DARP workforce are supplied by Ms. Martinez, Hendren's Office Manager, in her affidavit. *See* Doc. 95-4, p. 4.  Hendren even argues, based on Ms. Martinez's word alone, that "[a]fter Hendren Plastics stopped providing work opportunities for DARP participants, the company's productivity and profitability increased significantly."   *Id.*  Not only is such a claim self-serving and unsupported by any actual data, but its veracity would require the Court to believe that Hendren employed a workforce that decreased its overall productivity for at least a three-year period.

this argument, DARP claims that its particular way of doing business, is the only way that privately-run residential substance abuse programs can stay afloat. DARP believes the state's interest in diverting substance abuse addicts from the prison system through the drug courts will be utterly thwarted if the Court cries foul on DARP's violations of the wage and hour laws. The Court does not share DARP's views. DARP's claim that its business model is the only viable one for residential substance abuse programs is unsupported by any evidence, financial or otherwise.[8] More importantly, DARP's position ignores the strong public policy reasons behind the implementation of the AMWA, which are:

> to establish minimum wages for workers in order to safeguard their health, efficiency, and general well-being and to protect them as well as their employers from the effects of serious and unfair competition resulting from wage levels detrimental to their health, efficiency, and well-being.

Ark. Code Ann. § 11-4-202.

As the Supreme Court emphasized in *Alamo*, when an employer exerts superior bargaining power over its workers, the likelihood grows that the employer may "coerce

---

[8]  In fact, the record contains two letters that confirm that programs similar to DARP's operate in Arkansas *and* pay their residents a minimum wage. Both letters are addressed to DARP's Glen Whitman by members of Arkansas Department of Community Correction ("ACC"), a state agency that "is responsible for adult parole and probation supervision and the operation of six facilities that are licensed residential treatment centers." https://www.dcc.arkansas.gov/about-us (last visited September 23, 2019). The ACC is also the same body that supervises the Arkansas drug court program. *See* https://www.dcc.arkansas.gov/programs-and-services (last visited September 23, 2019). The first letter is from Sheila Sharp, Director of the ACC, and is dated October 2, 2014. Ms. Sharp informs Mr. Whitman in her letter that DARP will not "be given an exception to the policies that every other facility must adhere" and must pay "at least a minimum wage" to parolees of the Arkansas Department of Correction if they are to live in DARP's facility. (Doc. 90-32). The second letter, dated October 7, 2014, from Richard L. Guy, Transitional Housing Coordinator for the Arkansas Department of Correction, informs Mr. Whitman: "Your practice[s] of providing housing, clothing, obtaining documentation for employment, finding jobs, providing transportation, etc. are identical to [w]hat other facilities do while in compliance with current standards," namely, providing at least a minimum wage for residents' labor.  (Doc. 90-32).

employees" to say they performed the work voluntarily or cause them "to waive their protections under the Act." 471 U.S. at 302. That exact situation appears to have occurred in the instant case. Here, the facts establish that DARP's residents had no real choice but to sign admission forms as a condition of entry into the program. By signing those forms, they affirmed they would only receive in-kind benefits and not cash wages in exchange for their work. They were also required as a condition of entry into the program to sign forms that disclaimed they were employees under the law. On top of all that, DARP held all the power in the employment relationship—even more so than in the average employment situation—because these particular workers faced a return to drug court and possible imprisonment if they failed to comply with DARP's work requirements. Finally, the undisputed facts reveal that DARP's power was jointly held with Hendren, as Hendren also held the keys to the prison cell, so to speak, through its ability to notify DARP whenever a worker performed unsatisfactorily and would not be permitted to return to work.

The above analysis brings the Court to the common-sense conclusion that businesses that profit from the labor of non-incarcerated drug addicts must still comply with the AMWA's strict requirements. Though the Defendants would rather the Court pretend that the class members were actually prisoners when they lived at DARP, they were not. They were merely "charged with felony drug crimes," as Hendren concedes in its brief, not convicted of those crimes. (Doc. 94, p. 1).[9] Therefore, they were entitled to the basic rights under state law that all Arkansans are entitled to. Obviously, being subject

---

[9] Elsewhere, Hendren describes the class members as "a group of criminally-charged drug offenders who entered the drug court program hoping to avoid incarceration." (Doc. 94, p. 23).

to the jurisdiction of the state drug courts is not the same as being in prison. The Court also observes that the Defendants were not operating as charities. They were businesses that manipulated the labor market and skirted compliance with the labor laws for their own private ends. Consequently, they are jointly and severally liable under the AMWA for their failure to pay minimum-wage and overtime compensation to the class.

## B.    Affirmative Defenses

Before the Court turns to the issue of damages, the final topic to address is Hendren's affirmative defenses to liability. Hendren's first defense is that the class members validly assigned their wages to DARP by executing the Admission Agreement (Doc. 90-6) and Disclaimer of Employment Relationship (Doc. 90-43) when they entered DARP. In the alternative, Hendren maintains that the drug courts ordered the class members to assign their wages to DARP. Both arguments lack merit.

The Administrative Regulations of the Labor Standards Division of the Arkansas Department of Labor provide that an employee's wage assignment is only legal if "neither the employer nor any person acting in his behalf or in his interest derives any profit or benefit from the transaction." 010 Ark. Code R. § 14.1-107(c)(3). Obviously, DARP, an employer, would have benefited from such an assignment. It is undisputed that DARP derived its operating revenue directly from the money Hendren paid for class members' labor and from similar arrangements with other local businesses.

Hendren's alternative waiver argument is that, "by ordering the Plaintiff's [sic] to DARP, the drug courts tacitly agreed to the terms of DARP and ordered the participants' wages to be paid to DARP." (Doc. 94, p. 23). Of course, Hendren can point to no evidence to show the state ever audited DARP or was provided with a copy of the

Contract Labor Agreement that DARP and Hendren entered into to avoid paying wages and associated payroll taxes. There is no evidence to show that state drug court judges were personally aware of the details of DARP's and Hendren's business arrangement. The most that can be assumed from the facts in the record is that drug court judges referred participants to DARP's program because they trusted DARP to comply with state and federal law, *i.e.*, by calculating the workers' minimum hourly and overtime wages earned, *and then* subtracting from those totals the reasonable value of in-kind services that were deductible by law.[10] However, the record indicates that DARP has yet to calculate the value of its in-kind services and has not considered how much of a deduction from wages it may reasonably take under the law. Instead, DARP has simply assumed that its residents are not employees and are not entitled to cash wages.

Hendren directs the Court to the Arkansas Code at § 16-98-304, which empowers drug court judges to order offenders to pay court costs, treatment costs, residential treatment fees, and the like. Simply because drug courts *could have ordered* DARP residents to pay the costs of DARP's services does not mean the courts "ordered the participants' wages to be paid to DARP," as Hendren claims. (Doc. 94, p. 23). Those are two distinct legal obligations. And although DARP certainly claims that the money it received from Hendren and other employers were used entirely "to offset the cost of the program and facilitate its operation," (Doc. 91, p. 13), the Court has not been presented

---

[10] Jim Hendren, the owner of Hendren Plastics, Inc., claims in his deposition that he talked with drug court Judge Thomas Smith at some point and asked him whether DARP's program "complies with all laws and . . . requirements of the state," and Judge Smith allegedly told him that it did. (Doc. 95-10, p. 3). The context for this remark is misplaced. *See infra* at pp. 27–28. Regardless, it goes without saying that Mr. Hendren's conversation with Judge Smith does not absolve Hendren of liability for violating the AMWA.

with any objective data to demonstrate the program's costs in relation to the cash wages the class members would have earned during the relevant class period.[11]  Accordingly, the affirmative defenses are subject to dismissal.

## C.    Damages

An employee's remedies for violations of the AMWA are as follows:

> (a)(1) Any employer who pays any employee less than the minimum wages, including overtime compensation or compensatory time off as provided by this subchapter, to which the employee is entitled under or by virtue of this subchapter shall:
> . . . .
> > (B) Be liable to the employee affected for:
> >
> > > (i) The full amount of the wages, less any amount actually paid to the employee by the employer; and
> > >
> > > (ii) Costs and such reasonable attorney's fees as may be allowed by the court.
>
> (2) The employee may be awarded an additional amount up to, but not greater than, the amount under subdivision (a)(1)(B)(i) of this section to be paid as liquidated damages.

Ark. Code Ann. § 11-4-218(a).

Fortunately, there is no dispute about the number of regular and overtime hours the class members worked, and the parties also agree about the minimum-wage and overtime rates that apply to those hours.  *See* Doc. 100, pp. 32–33.  The Court will now address the parties' substantive claims and defenses as to each element of damages.

---

[11] DARP also admits that it has not "performed discovery regarding a detailed credit or set-off for each Plaintiff and class member." (Doc. 100, p. 29, Hendren's Response to Plaintiffs' Statement of Undisputed Facts; Doc. 102, DARP's Response (noting that it adopts Hendren's Response)).  Instead, DARP merely provided Plaintiffs with copies of its yearly tax returns for the relevant class period.  *See* Docs. 90-22–90-25.

### 1.     Unpaid Minimum Wages and Overtime Compensation

The Court will begin its discussion of damages by considering Hendren's liability first, followed by DARP's.   The Court rejects Hendren's argument that it already paid wages to the class members by making payments to DARP.   Hendren did not pay the class members directly, nor did Hendren pay DARP for the benefit of the class.   While it is true that Hendren paid monies to DARP in an amount equal to the class members' hourly labor, Hendren knew full well that DARP was not passing those monies along to their joint employees as wages.   *See* Doc. 90-21, Contract Labor Agreement (stating that DARP "agrees to provide workers for Hendren Plastics on a Contract Labor Basis . . . ." and "[t]he total man hours for all workers are to be paid to the D.A.R.P. Foundation on a weekly basis").   As joint employers, Hendren and DARP are jointly and severally liable for any damages owed to the class, and in that context, Hendren's argument may be more relevant.   But since no crossclaims are asserted between the Defendants here, the Court will not preemptively address any such issues.

As for DARP, it is undisputed that it provided in-kind services to the class members while they were employed.   Those services took the form of meals, housing, toiletries, clothing, transportation to and from Hendren's job site, and the opportunity to participate in NA or AA meetings.   The AMWA permits employers like DARP to claim an allowance to be charged against the minimum wage (but not against overtime compensation) for the "reasonable value of board, lodging, apparel, or other services in an amount *not to exceed thirty cents (30¢) per hour*."   010 Ark. Code R. § 14.1-107(D)(1) (emphasis added).   Some or all of the services DARP provided may qualify for this deduction; Plaintiffs contend, however, that DARP has yet to provide "itemized accounts showing the nature and

amount of any expenditures entering into the computation of the costs," which DARP must show to be entitled to *any* deduction, let alone the full deduction. 010 Ark. Code R. § 14.1-102(B)(4). DARP's position is that it does not need to provide documentation because its entitlement to the full deduction is obvious. It argues that "[a]ny reasonable calculation of the value of these benefits would greatly exceed thirty cents per hour." (Doc. 102, p. 13). The Court is inclined to agree with DARP.[12] But while it is undisputed that the class members received in-kind services from DARP, the Plaintiffs have yet to formally concede that the value of those services either meets or exceeds the statutory cap of $0.30 per hour. The Court interprets Plaintiffs' reluctance on this point as having more to do with a lack of corroborating data than logic or common sense.

Accordingly, although the Court presently finds as a matter of law that DARP is entitled to an allowance against the minimum wages owed, the Court will defer for the moment in making a finding as to the exact amount of that allowance, including whether it is equal to the full amount of the regulatory cap. The Court **ORDERS** Plaintiffs to file a supplemental response in which they either (i) formally concede and stipulate that the value of the in-kind services DARP provided to the class qualifies for the full $0.30-per-hour credit against regular wages owed, or (ii) explain any plausible scenario whereby the additional data they seek could reasonably result in a finding that the credit should be

---

[12] Hypothetically, if a class member worked 40 hours in a given week at a rate of $7.50 per hour, the class member would be entitled to wages in the amount of $300.00. If DARP were credited $0.30 per hour for those 40 hours, the total credit for the week would be only $12.00. It is difficult to fathom a scenario whereby the reasonable value of DARP's room and board would not greatly exceed that amount.

in some amount less than the regulatory cap.[13]  Plaintiffs' Supplemental Response shall be filed by no later than October 4, 2019.

Along those same lines, Plaintiffs are **FURTHER ORDERED** to state and explain within their supplemental response whether any documented payments DARP may have made to specific class members for successfully completing the program (characterized as "stipends" of either $500.00 or $1,000.00) should be deducted from the total damages owed to those respective class members.[14]

Before moving on to the issue of liquidated damages, the Court must pause to address Hendren's argument that the $0.30 cap on in-kind services should not apply in this case as a result of certain recent amendments to the AMWA. *See* Doc. 73-1, Act 853 of 2019. These amendments eliminated the $0.30 cap.  Now, an employer may claim a credit against its minimum-wage obligations by establishing "the fair and reasonable cost" of any board, lodging, apparel, or other benefits provided to an employee—up to and including the full amount of wages.  *Id.*  For the reasons explained below, the recent elimination of the $0.30 cap will not be given retroactive effect.

In Arkansas, retroactivity is a matter of legislative intent. *Bean v. Office of Child Support Enf't*, 340 Ark. 286, 296 (2000). Unless a statute expressly states otherwise, the Arkansas Supreme Court presumes that the General Assembly intends for its laws to

---

[13] Although DARP's underlying cost data is relevant in determining the reasonable value of in-kind services, its discovery may not be proportional if "the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1). Here, such discovery is *only* beneficial to the extent it is likely to demonstrate that the reasonable value of such services is *less* than the regulatory cap.

[14] The parties did not provide briefing on the appropriate legal treatment of these payments under the AMWA.  The Court has no information about how many of these "stipends" were paid or whether the data as to specific recipients is agreed or disputed.

apply only prospectively. *Id.* The presumption does not ordinarily apply to procedural or remedial legislation. *Id.*

> To be remedial, the courts must "give appropriate regard to the spirit which promoted [the legislation's] enactment, the mischief sought to be abolished, and the remedy proposed," but cannot "disturb vested rights, or create new obligations, but only supply a new or more appropriate remedy to enforce an existing right or obligation."

*Id.* at 298 (quoting *Harrison v. Matthews*, 235 Ark. 915, 917 (1962)).

Changing the amount of credit an employer may take against its minimum-wage obligations is not a remedial change because it disturbs vested rights. In particular, the amendment to the AMWA at issue disturbs an employee's vested right to collect a cash minimum wage that may, at most, be offset by a credit for in-kind services of up to $0.30 per hour. *Cf. Families, Inc. v. Dir., Dep't of Workforce Servs. Emp'r Contribution Unit*, 2016 Ark. App. 475, at 4 (finding that new legislation that affected whether an employer was required to pay unemployment insurance taxes was a substantive change and would not be applied retroactively). Accordingly, the legislature's recent elimination of the $0.30 cap has no bearing on the calculation of damages in this case.[15]

## 2.     Liquidated Damages

Plaintiffs have moved for an award of liquidated damages on behalf of the class. In this regard, the AMWA provides as follows:

> (2) The employee may be awarded an additional amount up to, but not greater than, the amount under subdivision (a)(1)(B)(i) of this section to be paid as liquidated damages.

Ark. Code Ann. § 11-4-218(a).

---

[15] For added context, the Court notes that DARP and Hendren severed their business relationship sometime in late 2017, whereas the amendments to the AMWA were passed in April of 2019 and became effective in July of 2019. So the damages calculation here is not affected by the elimination of the cap as envisioned by Act 853 of 2019.

The Court in its discretion finds that Plaintiffs and the class members are entitled to an award of liquidated damages equal to the full amount of minimum wages and overtime compensation owed.[16]  "Liquidated damages are not considered punitive, but are 'intended in part to compensate employees for the delay in payment of wages owed under the FLSA.'" *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 942 (8th Cir. 2008) (quoting *Hultgren v. Cnty. of Lancaster, Neb.,* 913 F.2d 498, 509 (8th Cir. 1990)).  Once a violation of the wage-and-hour laws is established, as is the case here, the district court is tasked with determining whether liquidated damages are to be awarded and in what amount. *See, e.g., id.* at 940, 943 (affirming district court's grant of summary judgment to the plaintiff on the issue of liquidated damages based on the lower court's finding that the employer failed to establish an honest intention to meet the FLSA's requirements).

The Eighth Circuit instructs that "[a]n award of liquidated damages under § 216(b) is mandatory unless the employer can show good faith and reasonable grounds for believing that it was not in violation of the FLSA." *Braswell v. City of El Dorado,* 187 F.3d 954, 957 (8th Cir.1999).[17]  "The employer bears the burden of proving both good faith and reasonableness, but the burden is a difficult one, with double damages being the norm and single damages the exception." *Chao*, 547 F.3d at 941–42 (quotation and citation omitted).  Here, Defendants have failed to carry their burden of showing they acted in good faith and with reasonable grounds in failing to pay wages to the class.  To

---

[16]  That total will be capable of final determination once the applicability of the $0.30-per-hour credit and the $500.00/$1,000.00 stipend is resolved.  The parties agree about the number of regular and overtime hours the class members worked, and they also agree about the minimum-wage and overtime rates that apply to those hours.  *See* Doc. 100, pp. 32–33.

[17] The FLSA's liquidated damages provision at 29 U.S.C. § 216(b) is materially the same as the AMWA's provision at Ark. Code Ann. § 11-4-218(a).

show good faith, "the employer must establish an honest intention to ascertain and follow the dictates of the FLSA." *Id.* at 942 (quotation and citation omitted). To meet the burden of proof on summary judgment, "a defendant employer must show that he took affirmative steps to ascertain the Act's requirements, but nonetheless, violated its provisions." *Id.* (quotation and citation omitted).

Plaintiffs have established that neither DARP nor Hendren took any affirmative steps towards reasonably ascertaining the AMWA's requirements. To begin with, there is record evidence that DARP was placed on notice by the ACC *prior* to the start of the class period that its program was out of step with "every other facility" that houses parolees of the Arkansas Department of Correction in refusing to pay at least a minimum wage. (Doc. 90-32). DARP ignored that red flag in favor of subjectively choosing to believe it was not "act[ing] with conscious wrong" because it was "provid[ing] hundreds of individuals with an alternative to incarceration." (Doc. 101, p. 14). It is clear DARP acted in its own self-interest and had no "honest intention to ascertain and follow the dictates" of the law, *Chao*, 547 F.3d at 942, because it believed doing so would be too expensive—or, in DARP's words, "economically unviable." *Id.* at 15.

As for Hendren, it contends that it acted in good faith because it paid DARP for the class members' labor. This might be a good argument if Hendren had reasonably believed its payments to DARP were being passed along to the class members as cash wages. But as the Court explained above in section III.C.1, Hendren knew full well that its labor payments were not being passed through to the class members in the form of wages. Hendren understood that its payments to DARP were being used to offset the program's operating expenses. And while the Court accepts at face value the notion that

Hendren had altruistic reasons for partnering with DARP in support of its mission,[18] the Court believes that Hendren was also motivated by its own economic interests—including less expensive hourly labor rates and avoidance of payroll taxes and worker's compensation premiums. The Court therefore finds that Hendren's payments to DARP in exchange for a supply of laborers does not sufficiently demonstrate a good faith and reasonable basis for believing that it was complying with Arkansas's wage and hour laws.

Hendren's next argument is that it acted in good faith because its owner, Jim Hendren, "spoke to a sitting judge and was assured this program was appropriate and beneficial to society." (Doc. 99, p. 23). The Court does not credit this argument.[19] The remark that Mr. Hendren attributes to Circuit Judge Tom Smith (Benton County's presiding judge over juvenile cases and drug court programs) was made with regard to the merits and community need for *programming*—including DARP's—that offers drug offenders alternatives to incarceration. (Doc. 95-10, at p. 3). The context of the conversation does not support the notion that Mr. Hendren was trying to ascertain whether DARP's program complied with the AMWA. Moreover, judicial officers are not permitted to dispense private advisory opinions on regulatory compliance matters. It was unreasonable for Mr. Hendren to have thought back then—much less argue now—that Judge Smith's passionately held beliefs about alternatives to incarceration[20] (conveyed

---

[18] For example, Hendren insists that it acted "sacrificially to help drug courts make a difference in people's individual lives and society as a whole." (Doc. 99, p. 24).

[19] To the extent Hendren offers Judge Smith's statement for the truth of the matter asserted, it is hearsay under Federal Rule of Evidence 801(c), and thus not competent evidence for the Court to consider on summary judgment.

[20] Judge Tom Smith was deposed in this matter. (Doc. 98-1). He was not asked about his conversations with Mr. Hendren, nor the context in which his statements or opinions might

in the context of a private conversation) were somehow intended as an assurance that Hendren's arrangement with DARP complied with Arkansas's wage and hour laws.

For these reasons, the Court finds that the Defendants have plainly failed to meet their burdens of "show[ing] . . . affirmative steps to ascertain the Act's requirements," *Chao*, 547 F.3d at 942.

## IV. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 87) is **GRANTED IN PART AND DEFERRED IN PART**. The Motion is **GRANTED** as to the issue of liability. The Court finds that Plaintiffs and the class members were employees and that Defendants were joint employers under the AMWA. Accordingly, Defendants are jointly and severally liable for any damages that are determined to be owed to the class for failure to pay minimum-wage and overtime compensation, as well as an equal amount of liquidated damages. The Motion is **DEFERRED** with respect to Plaintiffs' request that the Court determine as a matter of law the total amount of damages owed. It is not presently clear to the Court whether Plaintiffs dispute that Defendants are entitled to a credit in the full amount of the $0.30 cap on any deduction for in-kind services or whether any "stipends" DARP may have paid to certain

---

have been conveyed to Mr. Hendren. Judge Smith did testify, however, that he is an ardent supporter of alternatives to incarceration for drug offenders. (Doc. 98-1, pp. 21–23). It was Judge Smith's opinion that DARP's work alternative provided its residents a tremendous opportunity to restore structure in their lives, and he also believed that the value of these services exceeded minimum wage earnings. *Id.* To be clear, nothing in this Court's opinion should be construed as a disagreement with Judge Smith—whose opinions are cultivated from a wealth of experience on the bench. Nevertheless, Judge Smith's testimony bolsters the conclusion that his opinions were confined to the merits of alternative sentencing options. Judge Smith never considered, much less opined about, conflicting wage and hour laws.

class members should be deducted from the total damages owed to those respective class members. Plaintiffs are **ORDERED** to file a Supplemental Response explaining their positions on these issues by no later than **October 4, 2019**.

**IT IS FURTHER ORDERED** that Defendant DARP, Inc.'s Motion for Summary Judgment (Doc. 89) is **DENIED** and Defendant Hendren Plastics, Inc.'s Motion for Summary Judgment (Doc. 93) is also **DENIED**.

**IT IS FURTHER ORDERED** that the remaining tasks to prepare for trial as outlined in the Court's Case Management Order are held in abeyance pending further notice from the Court.

**IT IS SO ORDERED** on this 27th day of September, 2019.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE